LITTLE ROCK TOWEL AND LINEN SUPPLY CO. *v.*
INDEPENDENT LINEN SERVICE CO. OF ARK.

5-3202                                377 S. W. 2d 34

Opinion delivered March 30, 1964.

878

*Wright, Lindsey, Jennings, Lester & Shults,* for appellant.

*J. Allen Hanover* and *Wayne W. Owen,* for appellee.

GEORGE ROSE SMITH, J. The principal appellant, Jack S. Bew, was formerly the president and general manager of the appellee, a corporation engaged in the linen service business. Bew's contract with Independent Linen provided that during his employment with the company and for a period of five years thereafter he would not be connected directly or indirectly with any other linen service company or with any laundry anywhere within Independent Linen's territory in Arkansas, which included all the state except two small areas in the northwest and southwest corners.

In April of 1963 Bew decided to go in business for himself. To this end he created the other appellants, two

corporations, and in their names bought from Myron Lasker a family laundry business in Little Rock and a companion linen service business that Lasker had operated in conjunction with the laundry. A few weeks later Independent Linen brought this suit, not only to enjoin Bew from engaging in either the laundry business or the linen service business but also to compel him to transfer both his purchases to Independent Linen, on the theory that his conduct had been a violation of his fiduciary duty as an officer of the company. The chancellor entered a decree granting relief to the plaintiff on both grounds and denying Bew's counterclaim for back salary in the sum of $17,000. All three matters are in issue upon this appeal.

First, we are of the opinion that Bew is correct in his insistence that his agreement not to engage in either the laundry business or the linen service business for five years was contrary to public policy and void. A naked contract not to compete with another is against public policy. *Shapard* v. *Lesser,* 127 Ark. 590, 193 S. W. 262, 3 A.L.R. 247. Such an agreement is permissible, however, either in connection with the sale of a going business or, as here, in connection with a contract of employment. Yet even in those instances the restraint is unreasonable and void if it is greater than is required for the protection of the promisee or if it imposes an undue hardship upon the person who is restricted. Rest., Contracts, § 515, which we quoted with approval in *Marshall* v. *Irby,* 203 Ark. 795, 158 S. W. 2d 693. Owing to the possibility that a person may be deprived of his livelihood the courts are less disposed to uphold restraints in contracts of employment than to uphold them in contracts of sale. Williston, Contracts (Rev. Ed.), § 1643; Banks, Covenants Not to Compete, 7 Ark. L. Rev. 35.

The contract before us not only provided Independent Linen with greater protection than it required; it also imposed an undue hardship upon Bew. According to the proof there is a clear-cut distinction between a family laundry and a linen supply service. A family

laundry is engaged principally in laundering clothing and household linen for residential customers. A linen service company deals principally with commercial customers. Such a company owns commercial uniforms, restaurant linen, barber supplies, and the like, which the company rents to its patrons. Its routemen make calls at frequent intervals for the purpose of collecting soiled linen and replacing it with an equal supply of clean linen.

When Independent Linen and Bew executed their agreement the company was engaged in the linen service business, but never in its history had it been engaged in the laundry business. Hence its attempt to restrain Bew from entering the latter field went decidedly farther than the company's protection required. On this point the Restatement of Contracts, § 515, gives this pertinent illustration: "A employs B for five years as manager of a cotton mill. As part of the bargain B promises not to become a manager of a mill of any kind in the city where he is employed by A for three years after the termination of the employment. The restraint is more extensive than is necessary to protect A, and the promise is illegal."

Moreover, the attempted restraint for a period of five years was unnecessarily long and imposed an undue hardship upon Bew. The appellee relies upon *Orkin Exterminating Co.* v. *Murrell,* 212 Ark. 449, 206 S. W. 2d 185, where we upheld an employment contract containing a restraint. There, however, the business involved trade secrets, and the restriction was for only a year. We do not perceive that the linen service business really involves trade secrets. Hence the case at bar is controlled by *McLeod* v. *Meyer,* 237 Ark. 174, 372 S. W. 2d 220, where we held void an employment contract calling for a five-year restraint.

Secondly, the chancellor found that Bew had violated his fiduciary duty toward Independent Linen in purchasing the two businesses from Lasker. The decree in effect substituted Independent Linen for Bew as the purchaser of the Lasker enterprises. Bew was directed to transfer

the assets of those businesses to Independent Linen, and the latter was directed to reimburse Bew for the amount of his payments to Lasker.

In charging a breach of trust the appellee contends that Bew purchased the Lasker properties for himself at a time when he knew that his own employers were negotiating with Lasker for the same purpose. Bew insists that his employers had already lost interest in the Lasker properties before he took any step to acquire them. This issue involves a question of fact upon which we think the chancellor's decision to be contrary to the weight of the evidence.

We narrate only the salient points disclosed by a large record. Bew came to Little Rock in 1955 as executive vice-president and general manager of Independent Linen. That company was then a subsidiary of Memphis Steam Laundry, Inc. In November of 1962 Moe Pear and his associates organized All State Linen Service, Inc., and purchased all the stock of Memphis Steam. Thus Independent Linen became a subsidiary of All State.

Early in 1963 Lasker decided to sell his enterprises. He requested a Memphis attorney, Herbert Glazer, to see if Memphis Steam might be interested in the purchase. Glazer took the matter up with J. Allen Hanover, who was the attorney for Pear and his company, All State. Pear and his associates were interested and had two conferences with Glazer. They learned that Lasker owned a building in which he operated a family laundry as his main business and a comparatively small linen supply service. We think it a fair inference from the record that the Pear group were interested only in the latter.

Pear or some other officer of All State instructed Bew to inspect the Lasker plant. Bew did so and made a report which, as far as the record discloses, was entirely accurate. The appellee argues that the report may have been inaccurate and professes to have no knowledge about the true condition of the Lasker property. We find

it impossible to believe that the appellee filed a complaint seeking to take over Bew's contract without having first satisfied itself that the purchase was advantageous.

Bew was next instructed to see if Lasker would sell the linen supply business to Independent Linen and the rest of his holdings to others. This proposal was completely unacceptable to Lasker, who was determined to protect his employees by selling his holdings as a unit. Bew reported this fact to his employers, and in our opinion they had no further interest in the Lasker property. Charles Pear, one of the owners of All State, admitted on the witness stand that he had told Bew that if his report was correct he and his associates did not want to buy the laundry. There is no indication that Bew's report was not correct. Lasker and his local attorney both testified that they talked to Glazer by telephone and were informed that "the deal was dead." Lasker also stated positively that Bew did not approach him about buying the property for himself until "the Memphis deal . . . was dead." Furthermore, when Bew went to Memphis to inform Pear and another officer of All State of his purchase their only protest was that he was under contract not to enter a competing business. If they were really still actively negotiating for the Lasker property that fact would surely have been mentioned at once.

In insisting that there was a breach of a fiduciary duty the appellee relies strongly upon *Raines* v. *Toney*, 228 Ark. 1170, 313 S. W. 2d 802. That case bears little resemblance to this one, for there the corporate officer undermined his own company by acquiring one of its general agency contracts for himself. This language in that opinion is really applicable here: "This doctrine of 'corporate opportunity' is but one phase of the rule of undivided duty and loyalty on the part of corporate fiduciaries. It does not preclude a corporate fiduciary from engaging in a distinct enterprise of the same general class of business as that which his corporation is engaged [in], so long as he acts in good faith." We are not persuaded by the weight of the testimony that Bew acted in bad faith.

Furthermore, we are not at all convinced that the proper parties are before us. Lasker, who sold his business largely on credit, may well have an objection to the substitution of a new purchaser, especially as the contract provided for Lasker's employment as a consultant for seven years. Yet Lasker is not a party to the case. Indeed, there is reason to doubt if Independent Linen is the right plaintiff. There is almost no indication in the proof that it was ever intended that this particular subsidiary would purchase the Lasker properties. Bew mentioned only the proposal that Independent Linen buy the linen supply business. Charles Pear testified that he asked Bew whether he thought the Lasker property should be purchased "by All State," and whether Bew thought it would be a good purchase "for All State." Moe Pear and his associates were officers of the parent company. Their testimony relates only in general terms to their efforts to acquire the Lasker holdings. Yet Independent Linen is the sole plaintiff. Whether Bew may have violated a duty toward All State or toward the Pear group is not an issue in the case at bar. There is almost a complete absence of proof that he disregarded any obligation owed to Independent Linen, for that company is not shown to have been interested in the Lasker properties.

Thirdly, Bew filed a counterclaim for the recovery of back salary in the sum of $17,000. Prior to the fiscal year ending May 1, 1962, Bew's income as manager of of Independent Linen had averaged about $35,000 a year, reaching a peak of $48,400 in the last of the years mentioned. His contract of employment recited that his compensation would be fixed by mutual agreement. At the beginning of the 1962-1963 fiscal year the directors of Memphis Steam adopted a resolution setting his salary at $12,000 a year, plus five per cent of the profits. It was expected that under this resolution Bew's income would be about $35,000.

All State bought Memphis Steam in November of that year. On or about January 1, 1963, the directors of All State notified Bew that thenceforth he would be paid

a fixed salary of $20,000 a year, with no share in the profits. Bew insists that he did not agree to this arrangement, but the record simply does not support his contention. He continued to work for the company for three more months, accepting compensation at the new rate. There is no proof whatever of the amount of profits he might have received had the first resolution not been rescinded. In the circumstances he must be regarded as having acquiesced in the directors' decision to reduce his compensation to $20,000 annually.

The decree is reversed, and both the complaint and the counterclaim are dismissed for want of equity.

McFADDIN, J., concurs; WARD, J., dissents.

PAUL WARD, Associate Justice (dissenting). My dissent goes only to the second part of the majority opinion which deals with Bew's fiduciary relation as an agent of his employers.

The majority correctly state the issue "involves a question of fact." I cannot agree, however, with the majority that the chancellor's decision is contrary to the weight of the evidence. In this connection it is not necessary to cite cases sustaining the well established rule that in close questions of fact we do not disturb the findings of the chancellor. The rule is based on common sense and the obvious fact that the chancellor, who sees the witness, can judge his sincerity better than we who only see the printed words.

Apparently the majority rely heavily on the fact that Pear admitted he told Bew that if his report was correct Pear and his associates did not want to buy the laundry. The record reveals, however, that Bew gave Pear no time to see "if his report was correct" before he started negotiations in his own behalf. Bew is bound to have known he was obligated to people other than Pear, but he did not even take the pains to report to them. Consider also the following:

(a) Pear (at page 211 of the record) testified:

"He [Bew] also stated to me with the exception of a new boiler he did not have a piece of equipment in his plant I would have. I did say 'Jack, if we look into it and find everything you say is right and not worth looking into, we would not want it'."

(b) Guy Raby, President of the Memphis Steam Laundry, who, with Pear, instructed Bew to look over the Lasker businesses, testified (page 160-161 of the record) that Bew reported Lasker wanted a package deal.

"Q. Was that report that he gave you and Mr. Pear, was it favorable or unfavorable?

"A. Well at that time it did not sound too favorable.

"Q. What did you tell Mr. Bew at that time, to quit, cut off the negotiations?

"A. No we did not tell Mr. Bew that we were not interested because neither Mr. Pear or I were in position to give him such instructions. We had not had an opportunity to take it up with the Executive Committee or other officers of the corporations. So far as we knew negotiations were still in effect."

(c) Mr. Pear (page 210 of the record) stated he did not tell Bew the deal was off, and (on page 212 of the record) he said, "No, I did not break off negotiations."

It appears to me that the majority, in concluding the chancellor found against the weight of the evidence, failed to recognize the source of the testimony relied on to show "the deal was dead" when Bew started negotiations to buy from Lasker. It should be kept in mind that Lasker and his attorney only knew what Bew chose to tell them, and also that Glazer, who was Lasker's own agent, did not see fit to take the stand. Thus, we have Bew extricating himself from a tricky situation by his own "bootstraps."

As I read the record Bew fabricated a series of incidents and relied on them in an effort to escape the fiduciary duty imposed on him by law which is clearly and uniformly announced in many of our own decisions.

In *Raines* v. *Toney,* 228 Ark. 1170, 313 S. W. 2d 802, it was said:

"The law imposes a high standard of conduct upon an officer or director of a corporation, predicated upon the fact that he has voluntarily accepted a position of trust and has assumed the control of property of others."

In *Yahraus* v. *Continental Oil Co.,* 218 Ark. 872, 239 S. W. 2d 594, the Court had this to say (quoting from 2 Am. Jur. *Agency* § 252, pp. 203-204):

" 'It is well settled that an agent is a fiduciary with respect to the matters within the scope of his agency. The very relation implies that the principal has reposed some trust or confidence in the agent. Therefore, the agent or employee is bound to the exercise of the utmost good faith and loyalty toward his principal or employer. He is duty bound not to act adversely to the interest of his employer by serving or acquiring any private interest of his own in antagonism or opposition thereto. His duty is to act solely for the benefit of the principal in all matters connected with his agency. This is a rule of common sense and honesty as well as of law.' "

In *Collins* v. *Heilman,* 225 Ark. 666, 284 S. W. 2d 628, we find:

"We have often stated that an agent, regardless of how innocent his intentions may be, cannot place himself in a situation where personal interests conflict with the duties owed his principal."

In *McHaney* v. *McHaney,* 209 Ark. 337, 190 S. W. 2d 450, there appears this statement (from *Walthour* v. *Pratt,* 173 Ark. 617, 292 S. W. 1017):

" 'Everyone, whether designated agent, trustee, servant or what not, who is under contract or other legal obligation to represent or act for another in any particular business or line of business, or for any valuable purpose, must be loyal and faithful to the interest of such other in respect to such business or purpose. He cannot lawfully serve or acquire any private interest of his own in opposition to it.' "

See also to the same effect *Dudney* v. *Wilson,* 180 Ark. 416, 21 S. W. 2d 615, and *Walthour* v. *Pratt, supra.*

I would, therefore, affirm the trial judge on the point discussed.

ED. F. McFADDIN, Associate Justice (concurring). I concur in the result reached by the Majority, but through a process of reasoning slightly different from that shown in the Majority Opinion.

I agree with the Majority on the first point of the Opinion: Mr. Bew's agreement not to engage in the laundry business or linen service for five years was too broad and was therefore void as contrary to public policy.

I disagree with the Majority's reasoning on the second point. I cannot say that the finding of the Chancellor is contrary to the preponderance of the evidence. As I see it, Mr. Bew had no right to purchase the Lasker business for himself at the time he was in the employ of the appellee. I agree with most of the Dissenting Opinion of Judge Ward on this point.

But even while disagreeing from the **Majority's** reasoning on the second point, I nevertheless reach the same conclusion the Majority has reached; because, as I see it, the appellee is not entitled to take over Bew's contract of purchase from Lasker. Several points are . involved here. When Mr. Bew's corporations acquired the Lasker interests one of the integral and governing provisions of that contract was that Bew's corporations would employ Myron B. Lasker for a period of seven years at $6,500.00 a year. Lasker agreed to work for Bew's corporations, not for the appellee; and Lasker could not be forced to work for the appellee. Specific performance will not be granted on an executory contract to do work. *Leonard* v. *Board of Directors,* 79 Ark. 42, 94 S. W. 922. See also 49 Am. Jur. p. 157. Furthermore, Myron B. Lasker was not even a party to the record in this case Appellee might have been entitled to damages against Bew, but appellee is not entitled to an assign-

ment of the contract of sale. Appellee proved no damages, so wins a mere pyrrhic victory on this point.

As to the third point, I agree with the Majority that no damages were proved by Bew.

So I concur in the result reached by the Majority, but still maintain that Mr. Bew should not have dealt with Lasker while Bew was in the employ of the appellee.